Case No. 14-3960 John Yarberry v. Gregg Appliances Inc. Argument not to exceed 15 minutes per side. Mr. Klingler for the appellant. Good morning, your honors. May it please the court. I'm Robert Klingler here on behalf of the appellant John Yarberry. I'd like to reserve three minutes for rebuttal, if I might. Title I of the ADA gives every bit as much protection to mental disabilities as it does to physical disabilities. John Yarberry was the unfortunate victim of a mental illness, bipolar disorder. He didn't know he had it. Nobody knew he had it until the strange events of August 1st and 2nd, 2011. There was nothing Mr. Yarberry could have done to foresee the onset of the manic episode that led to his termination. There was nothing he could have done to prevent it. And there was nothing he could have done to warn his employer about the impending impairment. He did not delay in telling his employer about his disability. He didn't wait until after he was terminated to request an accommodation. He didn't go to work knowing that he had an impairment that might affect his performance. And he didn't threaten to injure anyone. These facts distinguish this case from all of the cases cited in support of Appellee's position and from all of the cases relied upon by the district court. Neither H.H. Gregg nor the district court suggests that John Yarberry should or could have done anything differently or that he's even responsible for what happened to him. Yet H.H. Gregg argues that its termination of Mr. Yarberry was justified by his bizarre conduct, regardless of its cause. But why? Just because it was extremely bizarre and weird, to use the words of loss prevention manager Todd Zimmerman? The record is devoid of any evidence that Mr. Yarberry's weird behavior caused by his disability required his termination as a business necessity. The statute itself, section 12112B6 of the ADA, provides that discrimination includes using qualification standards that tend to screen out an individual with a disability unless the standard is shown to be job-related for the position in question and consistent with a business necessity. In addition, the EEOC's guidance on applying performance and conduct standards to employees with disabilities provides if an employer cannot show that a particular standard is job-related and consistent with a business necessity, the employer cannot use the standard to take an adverse action against an employee with a disability. And that same guidance... On that EEOC guidance, I agree there's much in it that is supportive of your case, but what about the guidance that an employer can discipline employees, not just for violent conduct, but for what the EEOC guidance specifies as sending inappropriate or offensive emails, not observing safety or operational rules? Is that not a problematic standard for your case? Your Honor, I don't think it is in this case for a couple of reasons. Number one, the evidence in the record is clear and undisputed that this was a one-time occurrence from Mr. Yarberry. This is not the kind of disability that an employer is going to have to repeatedly put up with. Number two, there's nothing in the record to indicate that this particular action on behalf... by Mr. Yarberry required as a business necessity, as applied to Mr. Yarberry, required his termination. So the fact that the guidance gives that example has to be placed, I believe, in the context of the particular employer and the particular employee and the actions that were committed, the likelihood that it will be committed again, the burden it places on the employer. All of those things, I believe, need to be taken into consideration to adequately protect employees. And in this case, again, there's nothing in the record to indicate that Mr. Yarberry's conduct required as a business necessity H.H. Gregg to terminate his employment within about 24 hours from the time it occurred and without any investigation at all by H.H. Gregg into the manifestations of the disability itself. Why was this happening? Although he was invited by the fiancee who contacted H.H. Gregg to please contact me if you need any additional information. They took no steps whatsoever to try to investigate what was really going on with this employer and as this court has indicated, there comes a point when the employer must meet the employee halfway if the employee seems unable to request an accommodation. That also did not happen in this case. There was complete silence. So all we know on this record is that there was a one-time occurrence of odd behavior, not during business hours, did not affect any other employees except for the loss prevention manager and the HR people that were involved in investigating it, did not affect the goodwill of H.H. Gregg. So there's really nothing in this record to substantiate the defense that they need to establish that there was a business necessity and we believe that that is a jury question. For the jury to decide based on all of the facts, was this the kind of conduct that required H.H. Gregg to terminate him? They might come up with evidence at trial, but they haven't yet. Doesn't your argument depend upon whether the EEOC guideline is a blanket rule or not? If it's just a bright line rule that says that the employee can be terminated for violating the code of conduct and if the infraction is sufficiently serious, perhaps that's the end of the discussion. It doesn't matter what business necessity would have to say about it. The employer doesn't have to inquire as to business necessity. We do have these Sixth Circuit cases, Macy and Maddox, that would seem to lean against your argument. I don't think so, Judge, and this is why. The facts are so different. In Maddox, as you know, the employee, first of all, it was an alcohol case and the ADA specifically excludes alcohol disability-related conduct stemming from alcoholism from its protections. In addition, the court in the Maddox case said that nothing required him to get in his car and drive when he was intoxicated. He made a choice, essentially, to do that. The Hopkins case, I believe, was the other one you mentioned, Your Honor. Maddox and Macy were the two I mentioned. Macy has a statement that, quote, an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job. If that conduct disqualifies the employee from his or her job. But then the case seems to suggest that that means that it's a fireable offense, not whether you go through an analysis regarding the nature of the disability or the predictability of whether the behavior is going to reoccur. It really seems to suggest if it's a fireable offense, you really wouldn't have an action against the employer. Your Honor, with respect, that cannot be what that case ultimately means. That case, of course, was decided on its facts, and on those facts, the court determined that that employee was disqualified from his position. But there is nothing in the law or in the case law, in fact, there is opposite authority, to conclude that any fireable offense that an employer puts in his manual or posts is equally applicable when that conduct is the result of a disability. That is precisely what the ADA, the language in the statute itself, and the guidance say you cannot do. You cannot apply a job standard to a disabled employee because of that disabled employee's conduct unless you establish that it's both job-related and necessitated, required by a business necessity. We suggest that that's a factual issue, a case-by-case issue, that needs to be determined by a finder of fact on the particular facts of the case as to whether or not in this case, as applied to this person, was it required as a business necessity that Mr. Yarberry be terminated. And the facts, as we see them, show clearly that it was not. Again, a one-time occurrence, after work hours, didn't hurt anybody, caused no loss of property to the company. He was terminated in the end, your honors, he was terminated because he had a disability, because his disability caused him to engage in these bizarre behaviors, and that's undisputed. Of course the employee would say he was terminated for misconduct, for the behavior. If they had been advised he had the disability, but he had never exhibited the behavior, it would be a different case, would it not? Yes, but what makes this case unique, your honor, and what makes this case, we believe, so important to the court's jurisprudence and to this area of the law, is that Mr. Yarberry did not know he had a disability, and it's not a case where he just sat back and didn't tell his employer. Within minutes or hours of the manifestations of his disability, the defendant knew of those manifestations, and those manifestations themselves, the conduct that caused his termination, was the very conduct that was the manifestation of his disability. They learned of it essentially at the same time that Mr. Yarberry learned of it. That makes this case, it seems to me, different from most of the other cases, and then the other important distinguishing factor is that he didn't threaten anyone. He didn't threaten to kill students. He didn't threaten harm to other people. The guidance, I believe, and the courts have made sort of a bright line there. We're not going to require employers, no matter what the cause is, to retain employees who threaten students in a school or other people. That's understandable, but I think the cases have to be read in that light, because aside from that kind of bright line, the guidance, as your honor pointed out, the guidance is guidance. It's not a bright line, and when the guidance gives examples, the court, I believe, has to interpret those examples in the light of existing case law and applying those principles to the specific facts of this case. I see you're out of time, unless you want to take part of your rebuttal time. I would love to, but I better not, your honor. Thank you very much. Thank you. Apologies, your honors. Not at all. May it please the court, my name is Robert Seidler for H.H. Gregg. This court should affirm the judgment of the lower court, which held that H.H. Gregg properly terminated Mr. Yarbrough for his workplace misconduct, misconduct that Mr. Yarbrough himself admitted was inappropriate, particularly for a manager. He disarmed the store and entered it at 1 a.m. in the morning, your honors. He entered the store safe for no business purpose. He was in the store for no business purpose. He left the store with the alarm unarmed and thereby left the store's employees and its merchandise subject to all manner of threat. It was locked, though, wasn't it? He locked the door. He just didn't arm the alarm. I'm not sure that there's evidence in the record, your honor, that he locked the door, but even if he had, an individual could have broken in and nobody would have been the wiser. An individual could have been either stealing something from the safe or they could have been stealing something from the store or simply laying in wait for employees when they arrived in the morning and nobody would have known. He also outright refused to take a drug test, your honors, when he was directed to do so. He only agreed to do so later after he was suspended pending an investigation. H.H. Gregg terminates for refusal to take a drug test invariably. He also refused to allow the investigation. That's a terminable offense separate and apart from these other behaviors? It is, your honor. But to be fair, that's not why he was terminated, for failure to take the drug test. Well, he was terminated for a combination of all of these factors, your honor. Are you taking the position that your rule is that you can require an employee for whom you have no evidence on the job of a drug issue? You can say, I want you to have a drug test. Is it a random drug test policy or a post-misconduct or accident drug test policy? Your honor, this wasn't a random drug test. This was a manager who was paid on a salary basis. I'm asking you about your policy that you say you can discharge people for. If the individual is randomly selected or, if we're asking about it in a vacuum, if an individual is randomly selected or they're selected after a post-accident type of a testing and they refuse to do so, they can be terminated for refusing to cooperate with the company's drug testing protocol, your honor. Here, Mr. Yarbury was on the job. He ended up coming to work. He unlocked the store. He didn't have to come to the store, but he came to the store. He unlocked it. He went through the company safe. He left the store unlocked. He wasn't at work, but he was on company premises. He was on company premises, and the only reason he was able to be on company premises was because he was a manager that was responsible for that store and for the store's employees, your honor. His behavior, your honor, demonstrated a lack of professional judgment. It undermined the trust that H.H. Gregg has to place in these managers that are responsible for the stores. It violated H.H. Gregg's safety, detrimental conduct, and refusal to cooperate policies. Mr. Yarbury also offers no evidence of any individual that engaged in any similar conduct but was treated better than he was, despite it being his burden to do so at the prima facie stage. Even if he was disabled, and H.H. Gregg disputes that he was disabled on this record, he can't demonstrate a prima facie case under these facts, your honors. And even if he could demonstrate a prima facie case, he can't demonstrate that H.H. Gregg's reason for terminating his employment, his conduct as opposed to his alleged disability, was pretext. Mr. Yarbury's argument... What step of the prima facie case do you think he fails to satisfy? Well, first, your honor, he doesn't demonstrate that he's disabled. All we have here is evidence of a transient condition. Mr. Yarbury, at his own deposition, admitted that he didn't know whether he had bipolar disorder. What notice was the company provided? What notice did H.H. Gregg receive? H.H. Gregg received no notice that he had any condition prior to his termination. Well, H.H. Gregg did not terminate him until after they knew he had been committed to a psychiatric hospital. Isn't that what the record shows? That's not what the record shows, your honor. What the record shows is that he was terminated on August 3rd, at or before 1.03 p.m., when Ms. Bush, the sole decision maker in this matter, made the decision to terminate his employment. And didn't she reconsider that decision and email some of her fellow supervisory, employer supervisory staff? Well, your honor, she spoke with her boss. She also spoke with counsel. But there's, first of all, reconsideration or looking at the facts again. She never said that she, or testified that she was reconsidering her opinion. She was doing what any good H.R. manager would do, which is talking about this new information with her boss or with counsel. Why, if she's not reconsidering her decision, why would she be talking about new evidence? Well, because she wants to reaffirm that the decision that she made was correct, your honor. Didn't she testify that the decision was not hers alone, that she and, was it Edgar? I mean, Edgar made the decision together, and yet she didn't speak to him until after her initial suggestion that she would discharge him. Is that correct? It's not correct, your honor. Tell me what the record shows. Ms. Bush testified that she was the decision maker, your honor. It was her decision, and nobody in this case disputes that Mr. Edgar was a decision maker. Ms. Bush was the sole decision maker in this case, and if Mr. Yarberry's position that reconsidering or talking to her boss about new information somehow means that her prior decision to terminate him immediately wasn't final, then no decision is truly final. Is that a dispute of material fact since I believe there were conversations with family members after the 1 o'clock decision and before the 4.54, what I would consider the final decision, and the family members were not told that he had been discharged? No, it's not an issue of fact, your honor. In this court's Cash v. Spiegel-Roberts case, this court considered the plaintiff's argument in that case that the individual's termination be considered final as of either the date that it was entered into the company's system or the date that it was actually communicated to the employee via termination notice, and this court held... Those were those. That was the one where there was a decision and then some considerable amount of time before notice was received. Am I remembering that correctly? There were only a few days, your honor. A few days. We're talking about minutes and hours here, and that was a several-day delay. It just seems to me that what you've got is a final decision after this employer was aware of the fact that Yarbarian passed a drug test and that he had been involuntarily committed to a psychiatric hospital. Your honor, we believe that the case law, including the Burns case, demonstrates that the decision is to be fixed at the time that it's made, which is prior to 1.03 p.m. on August 3rd. But even if this court finds that there wasn't notice or there was notice to Ms. Bush, the court can still affirm summary judgment and should still affirm summary judgment on the basis that H.H. Gregg was permitted to terminate this employee based upon his conduct, not based upon his disability. Or the pretext stage, you would say, that you went at the stage that this was employment-related misconduct. Whether you examine it, your honor, at the qualification stage or the pretext stage, I think the analysis is the same. This individual, the employer, was applying a legitimate business rule. This employee engaged in conduct that violated workplace performance standards. It threatened the vital functions of H.H. Gregg's business. H.H. Gregg needs to protect its employees and its merchandise. These rules were reasonably calculated to do so. Mr. Yarbarian himself admits that he violated these rules and that his conduct was not appropriate for a manager. And this court has held that there is a distinction between a disability and the conduct arising out of the disability. The Supreme Court has actually addressed this issue in a footnote in the Raytheon v. Hernandez case, your honors, where it said that to the extent that the plaintiff in that case was arguing that his conduct arose out of his disability, the court said, we note that we've rejected that argument in a separate context, indicating that it would do so in this case if it had the opportunity to hear that. The vast majority of other decisions, your honor, of decisions from other jurisdictions, hold consistent with the Sixth Circuit's position in this case. And interestingly, even though in their statement in support of oral argument, Mr. Yarbarian stated that the reason for oral argument is because the Sixth Circuit has not had the opportunity to address this particular issue after the EEOC released its enforcement guidance. The enforcement guidance ends up supporting H.H. Gregg's position in this matter. The EEOC, like the Sixth Circuit, says that you can terminate for disability-related conduct, and it provides as examples of that conduct things like insubordination, things like profanity. It even cites the example of an employee who hugs customers. It says that it's consistent with business necessity and job-relatedness to enforce that type of a rule, that you can't hug a customer. Certainly if you can't hug a customer, you can't do what the employee did in this case, which was expose the company to all manner of threat. The fact that nothing occurred by grace of God or happenstance is not the issue, Your Honor. And what he's requesting to do in this case is he's not requesting the accommodation of additional time off. That's not what was requested. What he's requested is a do-over. He's requested that his conduct, his misconduct, be excused. And this court and several other courts have held that that is not a reasonable accommodation. That is, in fact, an unreasonable accommodation to excuse past misconduct. A reasonable accommodation is prospective, as the EEOC has said. You don't go back and excuse the prior misconduct. I think you made a statement earlier in your argument suggesting that you were not accepting the contention, or somehow uncertain about whether he, in fact, suffers from bipolar disorder. Maybe I misunderstood you. Could you explain that? Well, Your Honor, and the district court noted this in its order, Your Honor. First, he said at deposition that he didn't know whether he had bipolar disorder. And he acknowledged that he only saw the doctor who initially said that his conduct may have been related to bipolar disorder once. He's no longer on medication. He saw two subsequent medical providers that refused to diagnose him with bipolar disorder, and the most one was willing to say was that it was some sort of an adjustment reaction, which implies that it's more of a transient type of a condition, which even under the revised ADA wouldn't qualify as a disability, Your Honors. Was he asked to take an alcohol test immediately after this incident? He was. Did he agree to do so? He did not. He, in fact, said in his words, Your Honor, he said, No, I'm going to sit back and chillax. Was that a request for a drug test or an alcohol test? I believe it was a request for both, Your Honor. But he subsequently had a drug test, correct? He subsequently agreed to take one only after he was suspended pending investigation, after he refused to cooperate with the investigator. Had he been told he was suspended at that time? Yes, he had been because he had already met with the investigator, and the investigator told him during that meeting. When he had the drug test, who had he met with that told him he was suspended? Mr. Zimmerman, who is the loss prevention manager. And he met with him. Tell me where in the record it indicates that he met with him face-to-face? Yes. Well, I believe it was actually over the telephone, Your Honor, but they were speaking. Mr. Zimmerman asked him a number of questions. Mr. Yarbury would not allow him. He wouldn't stop talking. He wouldn't stop talking, which is consistent, incidentally, with somebody that is nervous about their conduct and is afraid that they're going to be discharged for their conduct. Or what the doctor has said is consistent with bipolar disorder, someone who cannot stop speaking. But as this Court has held, Your Honor, an employer is not required to make that sort of an assessment. An employer is not required to put on the coat of a doctor at that point, particularly where Mr. Yarbury himself had offered a number of reasonable explanations for his misconduct and continually downplayed it. In this case, he had said that he was stressed by his job and his fiancée and he thought he'd be fine if he just got some sleep, went to the movies, or had a beer and relaxed. He repeatedly told his boss not to worry, this isn't life or death. He repeatedly downplayed that behavior. So what Mr. Yarbury... Help me just one last time. His telephone call with Zimmerman, am I remembering the correct person that he spoke with? Yes, Your Honor. What exactly did he say regarding the fact that he was suspended? He told him that he was suspended pending further investigation. And that was the end of the conversation? I believe so, yes, Your Honor. Thank you. Thank you. Thank you. Mr. Yarbury did lock the door. He didn't arm the system, but the testimony is undisputed that other people had not armed the system in the past. It's not a terminable offense. That's not an issue. Let me ask you, your opposing counsel, I believe, suggested that your client is not currently under medication for bipolar disorder. Is that correct? As far as I understand right now, that's correct, Your Honor, but that's a red herring. It's undisputed. Why is it a red herring? Well, it's a red herring because the undisputed evidence in the record is that he was diagnosed by a doctor who treated him in the psychiatric hospital with bipolar I disorder. In a deposition, he testified that a few months later he saw another doctor in Cincinnati who had not seen him during the manic episode who said, I don't want to put bipolar in your records because it looks bad. There's no expert testimony on the other side. There's no actual testimony from that other physician in the record. It's a question of fact at the very least as to whether or not he suffered a manic episode from bipolar I disorder, and under the new ADA definition of disability, it has to be significant or not transient. On this record, it seems not to be unequivocally clear whether your client even suffers from bipolar disorder. If I had to, just based on what's been provided, if I had to make the decision, just speaking for myself, I wouldn't know if your client suffers from that or not. Your Honor. Because you've got doctors, one doctor saying he does, another doctor being unwilling to provide a diagnosis, and your client is not under medication for it, so I don't know what the situation is in that regard. Again, Your Honor, at the very least, that's a question of fact for the jury. They did not have him diagnosed by a doctor. They used his testimony about what his own doctor, subsequent doctor, said about maybe you don't have bipolar I disorder. What do you say about your client refusing to take a drug and alcohol test immediately? Because if your client refused to take, didn't have an alcohol test within a number of hours, then subsequently the test wouldn't have been any good. I assume that's why it wasn't pursued later, and the only thing then subsequently at issue was just the drug test. Your Honor, they have never contended, and there's nothing in the record to indicate that when he took the drug test it was too late. No, I mean, yeah, but I mean, I'm not talking about the drug test in terms of timeliness, but an alcohol test for intoxication, that has to be done within a certain time frame. H.H. Gregg concluded, Your Honor, that he was not intoxicated. I think that's a fair reading of the record. They sent him for a drug test because Zimmerman said, this looks like intoxication to me. Gary Eck, a divisional vice president, said, it looks like he might have an illness we need to be aware of. It's illness or intoxication. Intoxication was unequivocally ruled out, Judge. That leaves illness, and it's our position that when you take into account the fact that he talked without stop for ten minutes, when he did all these other different things that they were observing, this crazy behavior, that they were observing the manifestations of a disability, just as surely as we're observing the manifestations of a disability when a person with cerebral palsy is sitting in a wheelchair, and we're observing that, and we know, even if we don't know the diagnosis, that that person has a significant disability. When you read and consider what Ms. Bush knew, what she had read and heard at the time she made her first initial decision at 1.03 p.m., a reasonable conclusion, a juror could certainly decide, that she knew or should have known that she was observing the manifestations of a substantial impairment that affected one or more of his major life functions, thinking, interacting with others, that sort of thing. I know you're out of time, but just one last question. Where in the record would it appear that the employer conceded that there was no issue as to alcohol intoxication here? I say that, Judge, because the record contains no deposition testimony from anybody that, well, we couldn't really conclude. It contains no email communications between the defendants that say we... Is there no place in the record where the authorized representative of the employer explicitly conceded that he was not under the influence of alcohol? Is that what you're saying? I'm saying that, and also, Judge, this is important, that under their own policy, an employee is entitled to one positive on a drug test, and if they would have thought for some reason that that drug test was inaccurate, there would have been some discussion about whether or not we need to do more to give this person treatment in lieu of termination. Well, that's where there's a positive on a drug test that's not necessarily coupled with misconduct or behavior. That's just showing up on the drug test. Well, the only way they can test, they have random testing and other kinds of tests, and Your Honor asked this question. They have testing that can result from bizarre behavior, I'm paraphrasing, in the workplace. That's one of the reasons that in their policy they can test for drugs, and his behavior fit under that policy. If he had tested positive for drugs or alcohol, Your Honor, under their own policy, they would have given him the chance for treatment in lieu of termination. But because he didn't test positive, because, in fact, it was because of a mental disability, they fired him. That's got to be illegal in our position, Your Honor. I think we have your position in hand, and we've run considerably over. If I might ask one more question. Have the parties engaged in mediation through the Mediation Office of the Sixth Circuit? Yes. My look at the record indicated it was a very short time frame that you engaged with the Mediation Office. I would suggest that you might consider contacting Paul Calico and see if you can work something out in this case. That gives you the opportunity to have a hand in resolution of a case that appears, I think you could tell from our argument, to be a close case. Why don't you discuss that and let us know if you might engage in mediation again. We will do that, Your Honor. Thank you. Thank you. Thank you. And the case is submitted.